**In re AutoSTYLE PLASTICS, INC., Debtor.**

**Bankruptcy No. SG 96–83767.**

United States Bankruptcy Court, W.D. Michigan.

Aug. 18, 1999.

Henry G. Swain, LawWeathers & Richardson P.C. Grand Rapids, MI, I. William Cohen, Joel D. Applebaum, Pepper, Hamilton & Sheetz, Detroit, MI, for Debtor.

Elizabeth Chalmers, Grand Rapids, MI, trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ISSUED ON REMAND OF APPEAL

JO ANN C. STEVENSON, Bankruptcy Judge.

■ On December 31, 1997, this court issued *In re Autostyle Plastics, Inc.*, 216 B.R. 784 (Bankr.W.D.Mich.1997), subsequently appealed by Bayer Corp. (Bayer) and assigned to the Honorable Gordon J. Quist of the United States District Court for the Western District of Michigan. In his opinion, *Bayer Corp. v. MascoTech, Inc. et. al (In re AutoStyle Plastics, Inc.)*, 1:98–CV–658, slip op., 1999 WL 1005647 (W.D.Mich. May 25, 1999), Judge Quist affirmed the Bankruptcy Court's opinion with respect to all issues except Bayer's reclassification claim. Accordingly, our December 31, 1997 opinion was remanded for determination of the reclassification issue in light of the factors set forth in *Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625 (6th Cir.1986).

■ In *Roth*, the Sixth Circuit identified the following factors as determinative of whether a transaction is a loan or a capital contribution:

(1) the names given to the instruments, if any, evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date and schedule of payments;

(3) the presence or absence of a fixed rate of interest and interest payments;

(4) the source of repayments;

(5) the adequacy or inadequacy of capitalization;

(6) the identity of interest between the creditor and stockholder;

(7) the security, if any, for the advances;

(8) the corporation's ability to obtain financing from outside lending institutions;

(9) the extent to which the advances were subordinated to the claims of outside creditors;

(10) the extent to which the advances were used to acquire capital assets and;

(11) the presence or absence of a sinking fund to provide repayment.

"No one factor is controlling or decisive, and the court must look to the particular circumstances of each case." *Id.* at 630. "Nor are the factors to be given rigidly equal weight." *In re Cold Harbor Associates, L.P.*, 204 B.R. 904, 915 (Bankr. E.D.Va.1997).

The underlying question when looking at these agreements in light of the *Roth* decision is: How definite were the plans for repayment between the parties? If the terms are vague, the loan takes on the appearance of equity because it is assumed that a true creditor, dealing at arm's length, would demand specific repayment terms to protect its loan. Consequently, even though we start by separately analyzing each factor, we also examine how specific the agreements are as a whole.

*The Names Given to the Instruments*

"The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *Roth*, 800 F.2d at 631. In this case, it is undisputed that the agreements were labeled "Subordinated Participation Agreements" and there were documents entitled "Demand Notes" relating to the "Subordinated Participation Agreements." Consequently, this factor weighs in favor of a loan.

*The Presence or Absence of a Fixed Maturity Date and Schedule of Payments*

■ Although the first factor very obviously favors the existence of a debtor/creditor relationship, the next factor is more problematic. "The absence of a fixed maturity date and a fixed obligation to repay indicates that the advances were capital contributions and not loans." *Roth*, 800 F.2d at 631. In *American Offshore, Inc. v. Commissioner*, 97 T.C. 579, 602, 1991 WL 245194 (1991) the court stated, "The presence of a fixed maturity date weighs toward debt, but is not dispositive of a debtor-creditor relationship." And in *AMW Investments, Inc. v. Commissioner*, 1996 WL 270942 (U.S.Tax Ct.) it was stated, "The presence of a fixed maturity date may be offset by other facts in the record." We believe that the converse is also true, that being, the absence of a fixed maturity date weighs toward equity but is not dispositive of a capital contribution and that this may also be offset by other facts in the record.

Paragraph 2.1(a) of the MascoTech Subordinated Participation Demand Note[1] (Motion for Summary Judgment by MascoTech, Inc. and Citicorp Venture Capital, Ltd. Exh. 17) sets a specific schedule for payment of interest on each note but nowhere is there a set schedule for repayment of principal. There is also no fixed maturity date. Paragraph 2.1(c) of the same Demand Note states explicitly: "The outstanding principal balance of this Note and all accrued and unpaid interest thereon shall be payable ON DEMAND." Consequently, this factor weighs in favor of equity.

*The Presence or Absence of a Fixed Rate of Interest and Interest Payments*

Notwithstanding that the Agreements have no fixed maturity date and no pay-

---

1. Although at various times, we may reference only one of the Agreements or Demand Notes, we treat all Agreements and Demand Notes at issue identically for purposes of this opinion.

ment schedule other than full or partial payment due "on demand," they do have a fixed rate of interest of 2–1/4% above prime and require that interest payments be made on the first day of each month. "The presence of a fixed rate of interest and actual interest payments weigh toward debt." *Roth,* 800 F.2d at 625. Bayer argues that interest payments were deferred for most of the time the Subordinated Participation Agreements were in existence. Bayer concludes that this deferment of interest payments suggests that no interest was expected and therefore the advances were equity rather than loans (Bayer Corporation's Brief in Response and Opposition to Motion for Summary Judgment, at 42). We disagree.

 The underlying demand notes indicate that interest was payable on a regular basis. The fact that the parties subsequently agreed to defer interest payments does not detract from the fact that the participation agreements provided for both a fixed rate of interest and interest payments. Rather, it shows a continued financial commitment to the Debtor that should not be used as a basis to reclassify the lender's claims as equity. It also shows that the Agreement has specific repayment terms. Consequently, this factor weighs in favor of a loan.

*The Security For the Advances*

"The absence of security for the advances is a strong indication that the advances were capital contributions rather than loans," *Roth,* 800 F.2d at 631. Bayer argues that MascoTech and Citicorp never obtained any separate security interests of their own in the Debtor's collateral. When initially considered, the financing was proposed in the form of an unsecured "bridge loan" directly to the Debtor. "Even though the parties attempt to paper the Subordinated Participation Agreements as secured loans, in substance they remain unsecured loans direct to the Debtor." (Bayer Corporation's Brief in Response at 42–43).

In our previous decision, *In re Autostyle Plastics, Inc.,* 216 B.R. 784, 790 (Bankr. W.D.Mich.1997) *aff'd, Bayer Corp. v. MascoTech et al. (In re AutoStyle Plastics, Inc.),* 1:98–CV–658, slip op., 1999 WL 1005647 (W.D.Mich. May 25, 1999), "All parties agree[d] that CIT had a first position in AutoStyle's assets pursuant to loans CIT made the Debtor. By purchasing participation interests, MascoTech, Citicorp and the State share CIT's first priority." Accordingly, we find that the Subordinated Participation Agreements were part and parcel of the CIT facility which had a properly perfected first priority security interest in all of the Debtor's assets. As a result, this factor weighs in favor of a loan.

*The Presence or Absence of a Sinking Fund to Provide Repayments*

"The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." *Roth,* 800 F.2d at 632. It is undisputed that the Debtor did not establish a sinking fund for repayments of the lender's advances pursuant to the Subordinated Participation Agreements. Accordingly, this factor weighs in favor of equity.

*The Source of Repayments*

"If the expectation of repayments depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution. An expectation of repayment solely from corporate earnings is not indicative of bona fide debt regardless of its reasonableness." *Roth,* 800 F.2d at 631.

The source of repayment of the participation interests were the same as the source of repayment to the CIT facility. While it is true that repayment was to be made from the Debtor's earnings, the CIT facility was based on a percentage of the value of the Debtor's assets. This is evidenced by the demand notes which describe the terms under which the debt had to be repaid. As previously decided, the assets of the corporation stood as security for the repayment of the loans. There-

fore, we find that this factor weighs in favor of a loan.

*The Adequacy or Inadequacy of Capitalization*

■ "Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans." *Roth*, 800 F.2d at 630. In this case, the Debtor was formed in the early 1960's. The Participation Agreements and all events related thereto took place in late 1987. The Debtor filed bankruptcy in 1996. Because of the long duration of time between the inception of the Debtor, the events at issue and the bankruptcy filing, we find that the initial capitalization of the Debtor is irrelevant.

This conclusion is supported by *In re Cold Harbor Associates, L.P.*, 204 B.R. 904, 917 (Bankr.E.D.Va.1997).

> Generally this factor is relevant when a corporation is started by the shareholders with a minimal amount of capital who then make a large loan of money to the newly formed corporation, and thus the relevant time for determining whether capitalization was adequate is generally at the corporation's creation. (Citation omitted). However, given the long duration between the inception of the partnership and the loan made in this case, this factor is not particularly relevant to the issue at hand. In the absence of contrary proof, this Court assumes that Cold Harbor was adequately capitalized when it was formed, and therefore, to the extent that it might be relevant, this factor would weigh in favor of holding the transactions more likely to have been loans.

Accordingly, we find that this factor weighs in favor of a loan.

*The Identity of Interest Between the Creditor and Stockholder*

■ "If advances are made by stockholders in proportion to their respective stock ownership, an equity contribution is

indicated... A sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is however, strongly indicative that the debt is bona fide." *Roth*, 800 F.2d at 629. As stated in *Cold Harbor*, 204 B.R. at 919, "Where there is an exact correlation between the ownership interest of the equity holders and their proportionate share of the alleged loan ... this evidence standing alone is almost ... overwhelming."

In this case, the Participation Agreements were entered into in connection with CIT's loans to the Debtor. The Debtor is a wholly owned subsidiary of AutoStyle, Inc. and therefore there is no relationship between the amount of the participation agreement and the stock ownership of the Debtor.

However, when looking at the stock ownership of the parent corporation, the percentages of the stock ownership and the participation interests are disproportionate. As of August 1988, Citicorp's participation interests accounted for over 82% of the subordinated participation interests while at the same time it owned 35% of the stock. After the additional contribution by MascoTech in March of 1990, MascoTech held 17% of the subordinated participation interests while owning 50% of the stock in AutoStyle, Inc.

Consequently, we find that this factor strongly weighs in favor of a loan.

*The Ability to Obtain Financing From Outside Lending Institutions*

■ "The fact that no reasonable creditor would [lend funds] is strong evidence that the advances were capital contributions rather than loans." *Roth* 800 F.2d at 631. The question to be asked is whether a reasonable outside creditor would have made a loan to the debtor on similar terms. *Cold Harbor*, 204 B.R. at 918. In the November 14, 1987, Minutes of the Board of Directors Meeting for C & F Stamping Inc.,[2] during the discussion regarding the Debtor's financing needs, Mr.

---

**2.** AutoStyle was originally incorporated as C & F Stamping, Inc.

Herman stated that they were in desperate need of $4 Million in short term cash to finance the basic investment in a paint line. It was also stated that Citicorp might be interested in loaning the funds in exchange for warrants that would be equal to 10% of the company's total capital. The Board was authorized to issue these warrants.

However, the Debtor was also able to obtain loans from disinterested lenders. In July of 1988, at the same time the participation agreements were executed, the Debtor obtained an unsecured loan from Pittsburgh National Bank, guaranteed by PPG Industries, Inc. for approximately $8.5 Million. In September 1988, Mellon Bank loaned the Debtor $4 Million. This loan was guaranteed and collateralized by Bayer. In addition, the Debtor had trade credit totaling approximately $14 Million. In November of 1988, Masco-Tech, not a shareholder of the Debtor at the time, made a loan of $26.8 Million in addition to a capital infusion of $10 Million. Furthermore, the Debtor was able to operate for over nine years after procuring these loans before it filed bankruptcy in 1996. Accordingly, this factor weighs in favor of a loan.

*The Extent to Which the Advances Were Subordinated to the Claims of Outside Creditors*

"Subordination of advances to claims of all other creditors indicate that the advances were capital contributions and not loans." *Roth*, 800 F.2d at 631–32. In this case, the participation interests of Masco-Tech and Citicorp were subordinated only to CIT due to the nature of the Subordinated Participation Agreements, not all other creditors. Consequently, this factor weighs in favor of a loan.

*The Extent to Which the Advances Were Used to Acquire Capital Assets*

"Use of advances to meet the daily operating needs of the corporation rather than to purchase capital assets, is indicative of bona fide indebtedness." *Roth*, 800 F.2d at 632. In this case, virtually all of the funds advanced through the Participation Agreements were used to meet the daily operating needs of the Debtor. (Affidavit of Donald Morrison ¶ 5). Consequently, we find that this factor weighs in favor of a loan.

*Conclusion*

Having duly considered the various *Roth* factors, the evidence predominantly favors a finding that the advances are bona fide indebtedness. Looking to the Agreements as a whole, they appear to be specific enough to conclude that the relationship between the parties was one of debtor/creditor and not of shareholder/investor. Although the transactions did have some characteristics of a capital contribution, the factors that favor these conclusions are generally weak. In light of these findings, we hold that there is no basis to reclassify the claims of CVC or MascoTech as equity.